# WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

January 16, 2013

**VIA HAND DELIVERY**

Honorable Paul A. Engelmayer
United States District Judge, Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

   Re: United States v. Sierra, et al. S1 11-CR-1032-49 (PAE)

Dear Judge Engelmayer:

  We submit this letter in connection with the sentencing of Jonathan Evangelista in the above-captioned matter, which is scheduled before this Court on January 31, 2013 at 2:15 p.m.

  On October 2, 2012, pursuant to a plea agreement, Mr. Evangelista pleaded guilty to one count of conspiracy to distribute and possess with intent to distribute at least 200 but less than 300 grams of mixtures and substances containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(C), and 846.

  According to the Probation Office, Mr. Evangelista's Offense Level is 17 and his Criminal History falls into Category III. The recommended sentencing range under the Sentencing Guidelines is 30 to 37 months, and the Probation Office has recommended a sentence in the middle of that range, 33 months. However, the plea agreement entered into between Mr. Evangelista and the United States Attorney's Office identifies Mr. Evangelista's Criminal History as Category II, and the Government has informed defense counsel that it does not intend to seek a sentence greater than that indicated in the plea agreement. With a Criminal History of Category II, the recommended sentencing range under the Sentencing Guidelines is 27-33 months. For the reasons set forth below, we respectfully request that the Court consider a sentence below the Guidelines range of 27-33 months as "sufficient, but not greater than necessary to comply with the purposes" of sentencing under 18 U.S.C. § 3553.

  Jonathan was arrested on December 7, 2011 based on the Government's evidence of his having sold mixtures containing a total of 4.46 grams of cocaine to undercover officers over five

NEW YORK   WASHINGTON   PARIS   LONDON   MILAN   ROME   FRANKFURT   BRUSSELS
in alliance with Dickson Minto W.S., London and Edinburgh

occasions between December 13, 2010 and March 29, 2011. Between the time of these buys and before his arrest, Jonathan had taken substantial steps to turn his life around. Jonathan had moved away from New York City to Georgia, and he had found a stable job at the ▮▮▮▮ where he was well liked and respected. (See Presentence Report (the "PSR") at ¶¶ 76; 126; 138; see also Letter to the Court from Jonathan Evangelista (the "Evangelista letter") at 1-2; Letter to the Court by Ondina Marte ("Marte Letter").) At the time of his arrest, Jonathan had also been sober for five months. (See PSR at ¶130-131; see also Evangelista Letter.) Jonathan has accepted responsibility for the mistakes that led to the charges against him and deeply regrets his actions. From the moment that he was arrested, Jonathan, through his counsel, made clear that he intended to plead guilty and accept responsibility. Jonathan also wishes to be a better role-model for his son who is now five years old. (See Evangelista Letter at 2.) He does not want his son to grow up without a father, and he realizes that will only be possible if he lives a substance-free, law-abiding life. (Id.)

**Jonathan's Background**

Jonathan is 24 years old. He was born ▮▮▮ in New York, NY. (See PSR ¶ 118.) He is the youngest of three children born to Victor Evangelista and Ondina Marte. (See id.) Jonathan's parents separated when he was three years old, and he has had no contact or relationship with his father since that time. (See PSR ¶ 120.) Jonathan was raised in the Riverdale area of the Bronx by his mother and maternal grandmother, Ramonita Marte, who Jonathan describes as "having kept the family together." (See PSR ¶ 120.) Despite his mother's efforts to support her family by running an in-home childcare service, the family often experienced financial difficulties requiring them to seek public-assistance benefits, and Jonathan's father did not provide any financial support for his family. (See PSR ¶ 121.)

On November 21, 2001, when he was just 13, Jonathan was severely injured when a car hit him while he was out rollerblading.



Jonathan's car accident appears to have been something of a turning point in his life. Following his car accident, Jonathan was unable to continue his public education at Middle School 141. (See PSR ¶ 135.) Although Jonathan was homeschooled while he was recovering, the accident and associated absence from school caused him to fall behind and, ultimately, led to his dropping out of John F. Kennedy High School in the 11th grade. (See PSR ¶ 134.)

In 2002, Jonathan's grandmother and caretaker passed away, and in August of that year, Jonathan was arrested for the first time. (See PSR ¶¶ 88; 120.)

January 14, 2013
Page 3

       At about 15 years old, Jonathan began smoking marijuana, and he used it daily until he made the final decision to change his life in July of 2011. (See PSR ¶ 130.) At the age of 18, Jonathan also began taking Percocet, a drug for which he did not have a prescription, which he often used in conjunction with marijuana. (See id.) Jonathan's drug addiction—coupled with his desire to make money to ease the financial burden on his mother—had a very detrimental impact on his life. Jonathan's drug addiction clouded his judgment and negatively impacted his behavior, contributing to several arrests during his teenage years, many of which were related to the possession of drugs. (See PSR ¶¶ 88-104.) Jonathan recognized the troubling effect that drugs were having on his life in 2010, and in March of that year, he and the mother of his child moved to Columbus, Georgia to be near Jonathan's mother and sister who lived there. (See PSR ¶ 75) Unfortunately, Ms. Soto, the mother of Jonathan's child, did not get along with his sister and did not like Georgia. She informed Jonathan that she was leaving Georgia, and Jonathan returned to New York with her in order to remain near his son. Regrettably, once back in New York, Jonathan again struggled with addiction and began to get back into trouble. (See PSR ¶¶ 101-102; 107-117.)[1]

       As indicated in the PSR, Jonathan has also twice sought outpatient drug treatment. (See PSR ¶ 132.) Unable to successfully complete these programs and still struggling with addiction, Jonathan made a conscious decision in July of 2011 to abandon his old life and move to Georgia to live with his mother and to find honest work. (See PSR at ¶ 76; see also Evangelista Letter at 1-2.) In Georgia, Jonathan found gainful employment as a house man at the ▮▮▮▮▮▮▮▮▮▮ and was working hard to be a better man. (See PSR at ¶ 138; see also Marte Letter.) During this time, Jonathan was liked and respected, and he often went out of his way to help others in need. (See Marte letter.) Additionally, since moving to Georgia in July of 2011, Jonathan has not used or sold drugs. And, if he is released and allowed to return to Georgia, his mother has been assured that his old job will be waiting for him. (See Marte letter.)

       In his own words, "[e]ven though [i]t was only 400 dollars every two weeks[,] and half of that was going to my child and to helping my mom with some bills[,] I was able to sit back with the rest of my money and relax, and say I work for this. What a great feeling that is." (Evangelista Letter at 2.) When released from custody, Jonathan fully intends to go back to a law-abiding life and that "great feeling" of honest work. (Id. at 3.)

       Although Jonathan is no longer in a relationship with his son's mother, the two maintain an amicable relationship, and Jonathan wants to make up for time lost with his son as a result of his prior drug addiction and poor decision making. Jonathan is determined not to allow his son to repeat the mistakes of his father and wants to be part of his son's life. (See Evangelista Letter at 2; see also Marte Letter.) Jonathan also very much wishes to support his son and to become an active parent and role model. (See Evangelista Letter at 2; see also Marte Letter.) He wants to "be able to show [his

---

[1]     PSR ¶ 115-116 describes an arrest for trespassing at 3410 Kingsbridge Avenue. However, Jonathan was arrested for being at his own home. As described in PSR ¶ 125, Jonathan lived at 3410 Kingsbridge Avenue at the time of this arrest.

son] how to live life the right way, tell him that school is the most important thing when growing up, [and] have him look up to his father as a working man and not the drug dealer on the corner." (Evangelista Letter at 2.) Jonathan also wants the opportunity to make sure his son "does not grow up the same way [he] did and [to] give him opportunities [Jonathan] never had." (Id. at 2.) Jonathan realizes that he cannot accomplish any of these goals from jail or if he is not sober.

Jonathan's youthful bad decisions are not an accurate portrait of the man that Jonathan has become or of the man that he hopes to be once he is released. (See Evangelista Letter at 2-3.) He fully understands and accepts that he must be punished for his past conduct, but he very much wants the opportunity to make amends and to continue on the path towards self-improvement. Accordingly, we, like Jonathan, respectfully request that Your Honor give Jonathan the lowest sentence that Your Honor believes is fair given what Jonathan has done and in light of the commitment that he has made to being a better man. (See Evangelista Letter at 3.)

### The Offense Conduct

As set forth in the PSR, the instant offense relates to Jonathan's role in a conspiracy to violate the narcotics laws of the United States. Jonathan was arrested following five sales of cocaine to undercover officers in the Bronx between December 13, 2010 and March 29, 2011, for various amounts of mixtures containing a total of 4.46 grams of cocaine, worth between $60 and $550. In his plea agreement, Jonathan stipulated to having distributed between 200 and less than 300 grams of cocaine. (See PSR at ¶ 49.) Jonathan was arrested in Columbus, Georgia by DEA agents on December 7, 2011 and has been in custody ever since. (See PSR at ¶ 51.)

### Jonathan's Sentence

According to the Probation Office, Jonathan's Offense Level is 17 and his Criminal History falls into Category III. (See PSR at ¶¶ 87, 106 and 148.) The recommended sentencing range under the Sentencing Guidelines is 30 to 37 months. (See PSR at ¶ 148.) The Probation Office has recommended a sentence in the middle of this range, 33 months. However, we believe a sentence below the Guidelines range is "sufficient, but not greater than necessary to . . . reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," as well as to afford adequate deterrence. 18 U.S.C. § 3553(a)(2)(A) and (B.)

As a result of the omission of a Youthful Offender conviction (incurred at the age of 15) from Jonathan's rap sheet, in entering into a plea agreement with the U.S. Attorney's Office, defense counsel and Jonathan all believed Jonathan's Criminal History warranted a placement in Criminal History Category II. The parties agreed that a sentence within the Stipulated Guidelines range of 27 to 33 months' imprisonment would constitute a reasonable sentence in light of the factors set forth in 18 USC § 3553(a.) At the time of defense counsel's last call with the U.S. Attorney's Office on January 8, 2013, Assistant U.S. Attorney Rachel Maimin indicated that the U.S. Attorney's Office would not seek a sentence outside the agreed upon range.

Further, in the PSR, the Probation Office incorrectly states that Jonathan is a member of the Bronx Trinitarios Gang. (See PSR at 33.) Jonathan is not now and has never been a member of the Bronx Trinitarios Gang. Moreover, the Government has never alleged or indicated to defense counsel that it believes Jonathan is or was a member of the gang. The Probation Office's recommendation of 33 months should be given less weight as a result, because it is inflated based on a misguided understanding of Jonathan's past and of his involvement in this case.

*History of the Defendant and Acceptance of Responsibility*

The record reflects several factors relevant to 18 U.S.C. § 3553(a)(1) that support leniency for Jonathan based on his background and recent history. As previously noted, Jonathan accepts responsibility for the mistakes that led to the charges against him and fully understands that what he did was wrong. Not wishing to burden the Government and hoping to resolve the charges against him as quickly as possible, Jonathan was the very first defendant charged in the indictment to inform the Government of his desire to plead guilty and to enter into plea negotiations. (See Evangelista Letter at 1.)

Moreover, Jonathan has shown remorse and a desire to become a valuable and contributing member of society. He wishes to continue making progress in his life and he never wants to go back to his old behavior. (See Marte Letter.) His desire to support his son and become a role model for him is additional motivation for him to continue leading a law-abiding, drug-free life. (See Marte Letter.) Jonathan is also fortunate to have the love and support of his family. As his mother, Ms. Marte stated in her letter, she is "more than willing to provide Jonathan with every aspect of support, guidance, accountability and love." (See Marte letter.) Thus, once released, Jonathan will be able to look to his mother for support and for accountability as he continues to better himself and to resist his former temptations.

*Need For the Sentence Imposed*

In imposing a sentence on Jonathan, the Court should also consider the effect that the sentence will have with regard to deterrence and the prevention of further crimes. (See 18 U.S.C. § 3553(a)(2)(B) and (C).) Jonathan respectfully submits that a lesser sentence is appropriate and sufficient to achieve both purposes.

Jonathan has repeatedly expressed his desire to leave his old life behind and had taken active steps to achieve that goal prior to his arrest. (See Evangelista Letter; see also PSR at ¶51; Marte letter.) His current outlook, as reflected in the facts presented above and in the letters submitted on his behalf, further supports the conclusion that he was already making a sincere effort to turn his life around, and is unlikely to commit further offenses.

Jonathan has already served over 13 months in prison for this offense. The best way for him to continue to atone and pay his debt to society is by serving a sentence that will allow him to support his young son as soon as possible by returning to gainful employment.

January 14, 2013
Page 6

      Given Jonathan's acceptance of responsibility for his actions, his sincere wish to lead an honest and productive life, and the steps he has taken to make progress in his life prior to his arrest, we respectfully urge Your Honor to impose a reduced sentence on Jonathan.

**Other Requests**

      Jonathan respectfully requests that he remain at the Metropolitan Detention Center in Brooklyn, New York so that he may be near his son who lives in New York.  Being near his son is extremely important to him, and Jonathan believes his proximity will provide continued motivation to stay on the right track while serving the remainder of his sentence.

      Respectfully,

      /s/ Michael Schachter

      Michael Schachter

cc: AUSA Rachel Maimin
    AUSA Nola Heller
    AUSA Jessica Ortiz